## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FARSHID M. ZADEH, SAMANEH
RAGHIMI, MOHAMED IYE, and SAIDO A.
ABDILLE,

        Plaintiffs,

    vs.

DONALD J. TRUMP, in his official capacity
as President of the United States of America;
UNITED STATES OF AMERICA; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICES; UNITED STATES
DEPARTMENT OF STATE; U.S.
CUSTOMS AND BORDER PATROL;
DANA J. BOENTE, in his official capacity as
Acting Attorney General of the United States;
JOHN KELLY, Secretary of the Department
of Homeland Security; LORI SCIALABBA,
Acting Director of U.S. Citizenship and
Immigration Services; KEVIN K.
McALEENAN, in his official capacity as
Acting Commissioner of U.S. Customs and
Border Patrol,

        Defendants.

Civil Action No.

**EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
AND STATEMENT OF POINTS AND
AUTHORITIES**

### INTRODUCTION

Plaintiffs are two couples whose lives have been devastated by President Trump's recent

Executive Order banning entry into the United States by immigrants from seven different

countries.

Plaintiffs have labored for years to complete the rigorous vetting and screening process

necessary before the United States grants a spousal immigrant visa. They have passed all

background checks, submitted all necessary documents, and completed all necessary interviews. After this extensive review, the government issued immigrant visas to Plaintiffs Raghimi and Abdille.

Plaintiffs, who have been married but living thousands of miles apart for years, upended their lives based on the grant of these visas. Raghimi quit her job as a university professor, moved out of her apartment, and sold her car and many of her belongings before boarding a flight to the United States. She did not learn of the Executive Order purporting to ban her entry until she landed in Amsterdam to change planes, at which point she was sent back to Iran. Abdille's flight is scheduled for February 4, 2017. She has been told she will not be allowed to board the flight. She currently lives in Nairobi and cares for her and Plaintiff Iye's two young daughters, ages 2 and 4. One of these little girls has a serious medical condition but is unable to get the care she needs in Nairobi. In anticipation of the move to the United States, Abdille terminated the lease on her apartment. She has no family in Nairobi. After February 4, 2017, she and the girls will have nowhere to stay.

Defendants' refusal to allow Raghimi and Abdille entrance to the United States derives from nothing more than naked prejudice. Raghimi and Abdille come from majority Muslim countries, and Defendants have sought to effectuate what is essentially a ban on Muslim immigration. Such a ban does not comport with the Constitution or the laws of the United States.

Plaintiffs have filed a Complaint in this matter, and they have a strong likelihood of success on the merits of their claims. Similar lawsuits have been filed in Washington, California, Virginia, Massachusetts, Michigan, and New York, and in each case the court concluded the plaintiffs' claims were likely to succeed. Because Plaintiffs' claims are likely to succeed, and

because plaintiffs continue to suffer irreparable harm due to Defendants' conduct, Plaintiffs respectfully request that the Court issue a Temporary Restraining Order and a Preliminary Injunction in this case that will: (1) restrain and enjoin Defendants from revoking or cancelling Raghimi's and Abdille's valid immigrant visas, and (2) restrain and enjoin Defendants from prohibiting Raghimi and Abdille from entering the United States pursuant to their validly issued visas.

## FACTUAL BACKGROUND

### I.   THE EXECUTIVE ORDER

On Friday, January 27, 2017, newly elected President Donald J. Trump signed an Executive Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "Executive Order"). (Complaint ¶¶ 31-34.)  In the wake of the execution of the Executive Order, Defendants have announced or have been directed to unlawfully implement a moratorium on refugees and valid visa holders from seven countries from entering the United States: Iran, Iraq, Libya, Somalia, Sudan, Syria and Yemen (the "seven countries"). (Complaint ¶¶ 31-34.)

The Executive Order is based on a claimed threat of terrorism at the hands of foreign nationals, and, pursuant to the purported threat, imposes substantial modifications to the policies and procedures governing the admission of non-citizens to the United States:

a.      A 120-day moratorium on the United States Refugee Resettlement Program ("USRAP");

b.      An indefinite suspension of Syrian national refugees from entering the United States, and the substantial reduction of all refugee entrants to the United States from over 100,000 to no more than 50,000 for fiscal year 2017;

    c.     The 90-day suspension of "immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12)" (because such entry would purportedly "be detrimental to the interests of the United States"). *See* Executive Order § 3(c). (Complaint ¶ 32.)

    Nations meeting the criteria listed at INA Section 217(a)(12), 8 U.S.C. Section 1187(a)(12), include the following seven nations: Iran, Iraq, Libya, Somalia, Sudan, Syria and Yemen (the "seven countries"). Executive Order Section 3(c) suspends entry into the United States by non-United States Citizen "immigrant[s] and nonimmigrant[s]" for 90 days. (Complaint ¶ 33.) The moratorium on and curtailment of refugees, as well as the freeze imposed on immigrants and nonimmigrants deriving from the seven countries from entering the United States was made by proclamation alone, and is not based on any quantitative or qualitative analysis. (Complaint ¶ 34.)

    The United States Department of Justice Office of Legal Counsel ("OLC") appears to have performed just a superficial review of the Executive Order's constitutionality. The January 27, 2017 OLC Memorandum evaluating the Executive Order is slightly more than one page in length. It catalogues the purported aims of the Executive Order and then concludes, baldly, that "[t]he proposed Order is approved with respect to form and legality." (Complaint ¶ 35.)

    Notwithstanding this bare-bones approval from OLC, on January 30, 2017, Acting Attorney General Sally Q. Yates issued a written statement regarding the Order:

> My responsibility is to ensure that the position of the Department of Justice is not only legally defensible, but is informed by our best view of what the law is after consideration of all the facts. In addition, I am responsible for ensuring that the positions we take in court remain consistent with this institution's solemn obligation to always seek justice and stand for what is right. At present, I am not convinced that the defense of the Executive Order is consistent

> with these responsibilities, nor am I convinced that the Executive Order is lawful.
>
> Consequently, for as long as I am the Acting Attorney General, the Department of Justice will not present arguments in defense of the Executive Order, unless and until I become convinced that it is appropriate to do so.

Trump fired Acting Attorney General Yates on January 30, 2017, just a few hours after Yates issued this statement. (Complaint ¶¶ 36-37.)

On February 1, 2017, in response to the "reasonable uncertainty" and "confusion" regarding the scope of the Executive Order, Donald F. McGahn, Counsel to the President, issued a "Memorandum to the Acting Secretary of State, the Acting Attorney General, and the Secretary of Homeland Security," which purported to provide "Authoritative Guidance" on the Executive Order. (Complaint ¶ 38.)

McGahn's Memorandum stated:

> Section 3(c) of the Executive Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (Jan. 27, 2017) suspends for 90 days the entry into the United States of certain aliens from countries referred to in section 217(a)(12) of the Immigration and Nationality Act (INA), 8 U.S.C. 1187(a)(12). Section 3(e) of the order directs the Secretary of Homeland Security, in consultation with the Secretary of State, to submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit the entry of certain foreign nationals from countries that do not provide information needed to adjudicate visas, admissions, or other benefits under the INA. I understand that there has been reasonable uncertainty about whether those provisions apply to lawful permanent residents of the United States.
>
> Accordingly, to remove any confusion, I now clarify that Sections 3(c) and 3(e) do not apply to such individuals. Please immediately convey this interpretive guidance to all individuals responsible for the administration and implementation of the Executive Order.

(Complaint ¶ 39.)

In other words, individuals currently holding Green Cards are exempt from the Executive Order. Individuals holding immigrant visas, who will be eligible for and receive Green Cards simply by entering the United States pursuant to their validly issued immigrant visas, are not exempt from the Executive Order. McGahn's Memorandum lacks any rationale for distinguishing between these two groups. (Complaint ¶ 40.)

President Trump, both in the past and very recently, promised that as President of the United States he would ban all Muslims from entering this country. For example, on or about December 7, 2015, then-presidential candidate Trump, referring to himself in the third person, publicly stated: "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States . . . ." (Complaint ¶ 41.)

Trump's campaign surrogate Rudolph Giuliani confirmed that the Executive Order is meant to serve as a Muslim ban. In a January 28, 2017 interview with Fox News, Giuliani was asked, "How did the president decide the seven countries?" He responded, "I'll tell you the whole history of it. So when [Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" Giuliani explained that he convened a "whole group of other very expert lawyers on this," including former U.S. attorney general Michael Mukasey, Rep. Mike McCaul (R-Tex.) and Rep. Peter T. King (R-N.Y.). "And what we did was, we focused on, instead of religion, danger — the areas of the world that create danger for us . . . Which is a factual basis, not a religious basis. Perfectly legal, perfectly sensible. And that's what the ban is based on. It's not based on religion. It's based on places where there are substantial evidence that people are sending terrorists into our country." (Complaint ¶¶ 43-44.)

The Executive Order further prioritizes admittance into the United States of religious minorities deriving from and suffering religious persecution in the seven enumerated countries. *See* Executive Order §§ 5(b), (e).  No similar prioritization was included in the Executive Order or otherwise announced for Muslim minorities in countries with a non-Muslim religious majority (*e.g.*, Myanmar, Israel, China, etc.).  (Complaint ¶¶ 44-47.)

President Trump has explicitly stated that this prioritization provision of his Executive Order is for the benefit of Christian minorities in Muslim-majority countries. On or about January 29, 2017, an interview between Trump and David Brody of the Christian Broadcasting Network aired. During the interview, Mr. Brody asked Trump whether he viewed persecuted Christians overseas as a "priority" for refugee status, to which Trump unequivocally replied: "Yes." *See also* Michael D. Shear & Helene Cooper, *Trump Bars Refugees and Citizens of 7 Muslim Countries*, N.Y. Times (Jan. 27, 2017) ("[President Trump] ordered that Christians and others from minority religions be granted priority over Muslims."); Carol Morello, *Trump Signs Order Temporarily Halting Admission of Refugees, Promises Priority for Christians*, Wash. Post (Jan. 27, 2017). (Complaint ¶ 48.)

## II.   PLAINTIFFS ZADEH AND RAGHIMI

Plaintiff Zadeh is a lawful permanent resident of the United States and is just several months away from being eligible for citizenship. (Complaint ¶ 5.) His wife, Sameneh Raghimi, was until recently a Professor of Industrial Design at Azad University in Mashadd, Iran, before resigning her position to move to the United States. (Complaint ¶ 5.) They have been married since November 2013. (Complaint ¶ 5.) They have seen each other only intermittently since their wedding, as Zadeh lives and works in the United States and Raghimi lives and works in

Iran. (Complaint ¶ 5.) After they married in 2013, Zadeh filed an I-130 Petition for Alien Relative on Raghimi's behalf. The I-130 Petition was approved. (Complaint ¶ 6.)

Raghimi then underwent, adhered to and fully complied with Defendants' policies, procedures and security background checks, including but not limited to: payment of all relevant fees to USCIS, National Visa center and the State Department; providing all the requisite documentation required by Defendants; and an interview of Raghimi at the United States Embassy in Ankara, Turkey by the U.S. Department of State. (Complaint ¶ 7.)

On November 18, 2016, the Department of State issued Raghimi an F21 immigrant visa to enter the United States as a lawful permanent resident. (Complaint ¶ 10.) In anticipation of beginning a new life with her husband in the United States, Raghimi quit her job as a professor at Azad University. (Complaint ¶ 11.) She terminated her lease and sold her car and many of her personal belongings in preparation for the move. (Complaint ¶ 11.)

Zadeh and Raghimi left Tehran, Iran on January 27, 2017, for the first leg of their flight to the United States. While they were in the air, Trump signed the Executive Order. When the couple landed in Amsterdam, Netherlands, a U.S. Customs or Immigration agent notified Raghimi that she would not be allowed to fly to the United States. Zadeh was informed, on the other hand, that he could return to the United States. (Complaint ¶ 12.)

Given the cost of the international tickets, and the need for Zadeh to return to the United States so that he could complete the last requirements to make him eligible for citizenship, the couple quickly decided that Zadeh should continue on and Raghimi would return to Tehran alone. Zadeh and Raghimi rushed to make arrangements for Raghimi to return to Tehran before Zadeh's flight left for the United States. The couple had just a brief moment to hug and say a tearful farewell before Zadeh boarded his plane and left Raghimi behind. (Complaint ¶ 13.)

Zadeh's and Raghimi's continued separation has been painful for the couple. Beyond the emotional consequences of the separation, the financial burden has been substantial. Raghimi resigned from her job at Azad University and currently has no employment. She cancelled the lease on her apartment and now has nowhere to stay. She is currently living in a hotel. She sold her car and all her personal belongings. She has nothing except the luggage she was traveling with, and some of her luggage, including her computer and some of her clothes, ended up in Minneapolis with Zadeh. Raghimi has no family in Tehran to help her during this time.

## III.   PLAINTIFFS IYE AND ABDILLE

Iye was born in Somalia and became a naturalized U.S. citizen in 2010. He married Abdille in Nairobi, Kenya, in September 2011. Abdille and Iye have two daughters together. Both children are U.S. Citizens. One child, Nimo, was born in July 2012. The other, Nafisa, was born in November 2014. Nimo has microcephaly and requires special medical care. Abdille, Nimo, and Nafisa live together in Nairobi, Kenya. (Complaint ¶ 14.)

In February, 2012, Iye filed an I-130 Petition for Abdille to come to the United States on an immigrant visa. Abdille's I-130 Petition was approved. Abdille then underwent, adhered to and fully complied with Defendants' policies, procedures and security background checks, including but not limited to: payment of all relevant fees to USCIS, National Visa center and the State Department; providing all the requisite documentation required by Defendants; and an interview of Plaintiff Abdille at the United States Embassy in Nairobi, Kenya, by the U.S. Department of State. (Complaint ¶¶ 15-16.)

It took almost 5 years of screening and vetting, but on January 18, 2017, the State Department issued Abdille an IR1 visa to enter the United States as a lawful permanent resident.

Plans were made for Abdille, Nimo, and Nafisa, to leave Nairobi and join Iye in Minnesota, and a trip was booked for February 4, 2017. (Complaint ¶ 17.)

On January 28, 2017, in the wake of the Executive Order, Abdille went to the Nairobi offices of KLM Airlines to confirm that she and her children would be allowed to travel to the U.S. They were informed that, because of the Executive Order, they would not be able to board their February 4, 2017 flight to Amsterdam. (Complaint ¶ 18.)

The lease on Abdille's apartment terminates on February 4, 2017, and the family has nowhere to go after that date. Neither Abdille nor Iye have any other family living in Nairobi. The cost of a hotel will be prohibitive for the family. Further, Nimo desperately needs medical care for her condition. She cannot receive the care she needs in Nairobi. (Complaint ¶ 19.)

## MOTION

Pursuant to Fed R. Civ. P. 65 and LCvR 65.1, Plaintiffs hereby the move the Court to issue a Temporary Restraining Order and Preliminary Injunction enjoining Defendants from enforcement of the Executive Order and allowing Raghimi and Abdille to enter the United States on their valid visas. In support of this motion, Plaintiffs rely on the points and authorities described in the argument below.

## ARGUMENT

I.   **Standard for Granting Temporary Relief.**

To obtain a temporary restraining order, Plaintiffs must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm is likely in the absence of preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that an injunction is in the public interest. *See Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016) (citing *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015), *reh'g denied*, 136 S. Ct. 20 (2015)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A district court must balance

the strengths of the requesting party's arguments in each of the four required areas. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* Therefore, while Plaintiffs' claim on the merits is strong, temporary relief ought to be granted even if the arguments were less meritorious given how strongly the balance of harms weighs in Plaintiffs' favor, and vice versa.

## II.   Plaintiffs Are Likely to Prevail on the Merits Because the Executive Order Is Illegal for Several Reasons.

The Executive Order violates several provisions of the Constitution and federal statutes. It is so plainly illegal that the then-Acting Attorney General of the United States announced that she would refuse to defend it in court. Letter from Sally Yates, Jan. 30, 2017, *available at* https://www.nytimes.com/interactive/2017/01/30/us/document-Letter-From-Sally Yates.html. Therefore, Plaintiffs are very likely to prevail on the merits.

### A.   The Executive Order Violates the Equal Protection Clause.

Plaintiffs claim a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, on the ground that the Executive Order constitutes intentional discrimination by the federal government on the basis of religion and national origin. "Classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971). While the political branches may have more latitude in an immigration context (*see, e.g., Zadvydas v. Davis*, 533 U.S. 678, 695 (2001)) the United States does not set aside its values or its Constitution while protecting its borders. *See INS v. Chada*, 462 U.S. 919, 941-42 (Congress must choose a "constitutionally permissible means of implementing" its power over

11

immigration).  Religion is also an "inherently suspect distinction." *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  In this case, the Executive Order is at odds with the fundamental American promise that all are entitled to equal protection under the law.

The Executive Order, on its face, discriminates based on national origin without any sufficient and reasonable justification.  Additionally, as discussed in more detail below, the Executive Order discriminates based on religion.  On its face, the Executive Order requires immigration officials to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  As detailed above, comments by President Trump and his advisers make clear that the intent of this provision is to give preference to Christians while disadvantaging Muslims.  Plaintiffs need not show that the intent to discriminate against Muslims "was the sole purpose of the challenged action, but only that it was a 'motivating factor.'"  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).  There can be no dispute that the executive order uses suspect classifications.  And it does so not in furtherance of a congressionally-authorized purpose, but rather in direct violation of federal law, as discussed further below.  Thus, the Court ought to apply strict scrutiny.  The Executive Order cannot withstand strict scrutiny.

The Executive Order cites three rationales to support its temporary ban on admission of nationals of seven countries: "To temporarily reduce investigative burdens on relevant agencies . . . , to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals."  The first rationale—essentially a desire to conserve resources

by discriminating—is not compelling. The Executive Order is not narrowly tailored to achieve any of these goals.

The Executive Order is profoundly overbroad. It bans those from disfavored countries without any evidence that any individual poses a threat of terrorism. Additionally, while the Executive Order recites the tragic events of September 11, 2001, it imposes no entry restrictions on people from the countries whose nationals carried out those attacks (Egypt, Lebanon, Saudi Arabia, and the United Arab Emirates). Strict scrutiny requires a "perfect fit between the means and the ends . . . ." *Turner Broadcasting v. F.C.C.*, 910 F. Supp. 734, 747 (D.D.C. 1995). Here, there is no "fit" between the rationales advanced to support the Executive Order and the means used to further those rationales.

Moreover, the Executive Order was enacted with a discriminatory purpose and has a discriminatory effect on followers of the Muslim faith, including citizens of the United States. A law that is discriminatory in its purpose violates the Constitution's Equal Protection command. *See Washington v. Davis*, 426 U.S. 229 (1976); *Arlington Heights*, 429 U.S. 252. Courts can infer discriminatory purpose from the "impact of the official action," *Arlington Heights*, 429 U.S. at 266, and the "historical background of the decision." *Id.* at 267. Here, the evidence of discriminatory purpose is overwhelming. President Trump campaigned on the explicit promise of implementing a "Muslim ban." Rudolph Giuliani revealed in media appearances that the Executive order was crafted to effectuate just such a ban. A high ranking Justice Department official declined to enforce the Order because of its discriminatory origins. And the Order itself disadvantages Muslims nearly exclusively while creating a gerrymandered exception for Christians.

Plaintiffs can show a substantial likelihood of success on the merits of their Equal Protection claim.

### B.     The Executive Order Violates the Establishment Clause.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).  Thus, where a law "grant[s] a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Id.* at 246.  In *Larson*, the law at issue did not mention any religious denomination by name, but drew a distinction between religious groups based on the percentage of their revenue received from non-members, which had the effect of harming certain religious groups. *Id.* at 231-32. Because the law was focused on religious entities and had the effect of distinguishing between them in a way that favored some, the Court applied strict scrutiny. *Id.* at 246-47. These same principles apply where, as here the law attempts to use neutral language to systematically disadvantage members of the targeted religion. *See Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993).

As described above, the Executive Order was designed in a poor attempt to create a "legal" Muslim Ban.  The rhetoric used surrounding the Muslim Ban, the Executive Order's exception for Christian minorities, and the disparate impact on both Muslim visa holders and their legal permanent resident family members show that Plaintiffs are likely to prevail on the merits.

### C.     The Executive Order Violates Due Process.

Due Process requires that arriving immigrants be afforded those statutory rights granted by Congress and minimum due process rights attach to statutory rights. *Diah v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003).  In particular, those with valid immigrant visas (who will become

lawful permanent residents upon arrival) entering the United States have constitutional due process rights with respect to their entry.  The Fifth Amendment protects all persons who have entered the United States "from deprivation of life, liberty, or property without due process of law." *Mathews v. Diaz*, 426 U.S. 67, 69, 77 (1976) (internal citation omitted).  This protection applies to all persons within our borders, regardless of immigration status.  *Id.*  (Due Process Clause of the Fifth Amendment extends even to those "whose presence in this country is unlawful, involuntary, or transitory"); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  The denial of entry of valid visaholders, without an opportunity to be heard, is a *prima facie* violation of those due process principles.  The Executive Order provides that all individuals from the impacted countries be denied entry to the United States, irrespective of their immigration status. On its face, the Order bars legal permanent residents from impacted countries from reentry into the United States if they travel aboard.  The *de facto* travel ban denies Plaintiffs the right to connect with their families, "a right that ranks high among the interests of the individual." *See Kent v. Dulles*, 357 U.S. 116, 125 (1958).  The denial of entry to all persons from the seven affected countries, irrespective of immigration status, and resulting travel ban violate the due process rights of legal permanent residents and visaholders.

D.     **The Executive Order Violates the Immigration and Nationality Act.**

Plaintiffs are likely to establish that the Executive Order violates the Immigration and Nationality Act (INA).  Enacted in 1965, 8 U.S.C. § 1152(a)(1)(A) states, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." By suspending entry of immigrants holding legal visas from Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen, for 90 days, the Executive Order violates the INA.  While the INA refers only to discrimination in the issuance of an immigrant visa the statute would be rendered meaningless

if it did not equally prohibit denials of an immigrant's entry into the country altogether. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995) (holding that Congress, in enacting Section 1152, "unambiguously directed that no nationality-based discrimination shall occur") (judgement vacated on other grounds in *U.S. Department of State v. Legal Assistance for Vietnamese Asylum Seekers*, 117 S. Ct. 378 (1996)).

Defendants may argue that the President has power to suspend the entry of any class of aliens when their entry is detrimental to the interests of the United States. *See* 8 U.S.C. § 1182(f). Section 1182, however, was enacted in 1952, nearly a decade before Section 1152. The enactment of the INA in 1965, including Section 1152, marked a "profound change" in the law by abolishing the national origin quota system, establishing a uniform quota system, and prohibiting discrimination on the basis of race and national origin. *Olsen v. Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997) (citing Pub. L. No. 89-236). Passed alongside the Civil Rights Act of 1964 and the Voting Rights Act of 1965, the legislative history of the INA "is replete with the bold anti-discriminatory principles of the Civil Rights Era." *Olsen*, 990 F. Supp. at 37. It is inconceivable that, in enacting anti-discrimination provisions in 1965, Congress intended to leave the President with the ability to adopt the same sort of overtly discriminatory measures Congress was outlawing. In addition, this interpretation would render Section 1152 a nullity, as the President could waive it at any time for any reason. *See Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 473. Under Plaintiffs' proposed interpretation, however, the statutes can be read together and both serve a purpose. The President can still bar certain classes of aliens from the United States—just not based on those classes provided in Section 1182.

E.     **The Executive Order Violates the Administrative Procedures Act.**

Defendants actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance

of procedure required by law, in violation of the Administrative Procedure Act (APA), 5 U.S.C.

§§ 706(2)(A)-(D).

The scope of this Court's review is delineated by 5 U.S.C. § 706, which provides that the

"reviewing court shall . . . hold unlawful and set aside agency action . . . found to be "(A)

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B)

contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right; . . . [or] (D) without observance

of procedure required by law . . . ." 5 U.S.C. § 706(2) (emphasis added). The APA provides

further that, "[t]o the extent necessary to decision and when presented, the reviewing court shall

decide all relevant questions of law, interpret constitutional and statutory provisions, and 13

determine the meaning or applicability of the terms of an agency action." *Id.* § 706 (emphasis

added).

Defendants actions were based solely pursuant to the Executive Order, which expressly

discriminates against Plaintiff on the basis of their country of origin and was substantially

motivated by animus toward Muslims, in violation of the equal protection component of the Due

Process Clause of the Fifth Amendment, as outlined above.   The Executive Order exhibits

hostility to a specific religious faith, Islam, and gives preference to other religious faiths,

principally Christianity.   Respondents' actions were therefore "contrary to constitutional right,

power, privilege, or immunity," in violation of § 706(2)(B).   Further, as discussed above, the

INA forbids discrimination in issuance of visas based on a person's race, nationality, place of

birth, or place of residence.  8 U.S.C. § 1152(a)(1)(A).  As set forth above, Defendants' actions

also violated procedural requirements of the Due Process Clause of the Fifth Amendment, which

therefore violate § 706(2)(D) of the APA, which prohibits agency action taken "without observance of procedure required by law." For all of the reasons set forth in this section, Defendants' challenged actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In addition, Defendants' actions were arbitrary and capricious for their failure to consider "all relevant issues and factors." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 48–49 (1983). Under *State Farm*, for an agency action to survive arbitrary-and-capricious review, it "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation omitted). This "hard look" standard exceeds the "rational basis" standard applied under the Due Process Clause. *Id.* at 43 n.9. Here, the government has failed to consider many relevant issues and factors, including evidence regarding the low risk to U.S. citizens posed by immigrants like Plaintiffs who have already been seriously vetted for several years, and the relative risk presented by those arriving on different visa categories.

### III.   Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm Due to the Executive Order.

An irreparable injury "must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Additionally, the injury must be beyond monetary remediation. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (citing *Wisc. Gas Co.*, 758 F.2d at 674.) A party need not show, however, that "rigor mortis will set in forthwith" absent the requested relief. *See Massachusetts Law Reform Inst. v. Legal Services Corp.*, 581 F. Supp. 1179, 1188 (D.D.C. 1984) (internal citations omitted).

First, because Plaintiffs have shown that they are likely to succeed on their Establishment Clause claim, harm is presumed. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination."). Second, Raghimi and Abdille planned travel to the United States, and upended their lives in their home countries, in reliance on the United States' promise that they would be allowed to enter the country. Intending to become permanent residents, as their visas allowed, they sold belongings and property. They paid fees and went through a years-long vetting process. Yet now, so close to being united as families, they have been turned away, and are bearing significant emotional and financial costs sustaining the separation they believed was coming to an end. Additionally, Nimo, child of Plaintiffs Iye and Abdille, desperately needs medical care that she cannot receive promptly without grant of immediate injunctive relief. Plaintiffs will suffer irreparable harm if immediate injunctive relief does not issue.

## IV.   The Balance of Equities and Public Interest Favor Relief Now.

After concluding that Plaintiffs satisfy the first two factors, the traditional stay inquiry then calls for assessing the harm to the opposing party and weighing the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The last two stay factors, considering the impact of the stay on the other party and considering the public interest, merge in immigration cases because the Respondent is both the opposing litigant and the public interest representative. *Id.* As noted in *Nken*, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id.* at 436. While *Nken* notes that the public's interest in "prompt execution of removal orders" is greater where "the alien is

particularly dangerous" or "has substantially prolonged his stay by abusing the process provided to him," neither of those concerns are present in this case. *Id.*

In this case, the balance tips sharply in favor of Plaintiffs. The balance of equities and public interest always favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). Plaintiffs face substantially unstable situations away from the United States. There is not harm in allowing them to enter the United States given the many years of vetting they have already gone through. Given the discriminatory nature of the Executive Order and the humanitarian interests in unifying the family, an injunction is also in the public interest.

## V.   Every District Court That Has Addressed Similar Issues Has Issued Injunctive Relief.

Several similar cases have been filed around the Country in the last week. Counsel has not reviewed all of them in depth—more than fifty cases have been filed. But in every action that Counsel is aware of where a court has made similar considerations, the court has come to the same conclusion and has issued a temporary restraining order. *See Darweesh v. Trump*, No. 1:17-cv-00480 (E.D.N.Y filed Jan. 28, 2017) (enjoining, nationwide, defendants from removing individuals with approved refugee applications, holders of valid immigrant and non-immigrant visas, and any other individuals legally authorized to enter the United States.); *see also Tootkaboni v. Trump*, No. 17-cv-10154 (D. Mass. filed Jan. 29, 2017); *see also Aziz v. Trump*, No. 1:17-cv-116 (E.D. Va. filed Jan. 28, 2017) (similar injunction, but limited to the Dulles International Airport.); *see also Mohammed v. Trump*, No. CV 17-00786 (C.D. Ca. filed Jan. 31, 2017) (enjoining defendants, nationwide, from removing, detaining, **or blocking the entry of** persons with a valid immigrant visa.); *see also Doe v. Trump*, No. 17-cv-00126 (W.D. Wash. filed Jan. 28, 2017) (enjoining respondents from removing the petitioners); *see also Arab*

*American Civil Rights League v. Trump*, No. 17-10310 (E.D. Mich. filed Feb. 3, 2017) (permanently enjoining application of the Executive Order against lawful permanent residents of the United States.).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a temporary restraining order.

Dated: February 3, 2017

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Kit. A Pierson (D.C. Bar No. 398123)
S. Douglas Bunch (D.C. Bar No. 974054)
Sally Handmaker (D.C. Bar No. 1005414)
Julia Horwitz (D.C. Bar No. 1018561)
1100 New York Ave. NW
Suite 500, East Tower
Washington, DC 20005
(202) 408-4600
kpierson@cohenmilstein.com
dbunch@cohenmilstein.com
shandmaker@cohenmilstein.com
jhorwitz@cohenmilstein.com

- and -

Adam L. Hansen
(*pro hac vice* forthcoming)
**APOLLO LAW LLC**
400 S. 4th St.
Suite 401M - 250
Minneapolis, MN 55415
(612) 927-2969
adam@apollo-law.com

- and -

21

Kevin C. Riach
(*pro hac vice* forthcoming)
Benjamin R. Tozer
(*pro hac vice* forthcoming)
**FREDRIKSON & BYRON, P.A.**
200 S. Sixth St.
Suite 4000
Minneapolis, MN 55402
(612) 492-7000
kriach@fredlaw.com
btozer@fredlaw.com

- and -

Benjamin Casper Sanchez
(*pro hac vice* forthcoming)
Regina Jeffries
(*pro hac vice* forthcoming)
Linus Chan
(*pro hac vice* forthcoming)
**CENTER FOR NEW AMERICANS**
**UNIVERSITY OF MINNESOTA LAW**
**SCHOOL**
229 19th Ave. S.
Minneapolis, MN 55455
(612) 625-5515
caspe010@umn.edu
rjefferi@umn.edu
rlchan@umn.edu

- and -

John Keller
(*pro hac vice* forthcoming)
**IMMIGRANT LAW CENTER OF**
**MINNESOTA**
450 N. Syndicate St., Suite 200
St. Paul, MN 55104
(651) 641-1011
John.Keller@ilcm.org

- and -

Sarah Brenes
(*pro hac vice* forthcoming)
**THE ADVOCATES FOR HUMAN RIGHTS**
330 Second Ave. S., Suite 800
Minneapolis, MN 55401
(612) 341-3302
sbrenes@advrights.org

*Attorneys for Plaintiffs*